**SECURITIES & EXCHANGE COMMISSION, Plaintiff,**

v.

**Howard S. HOOVER, Jr., Defendant.**

**Civ. A. No. H–94–CV–0081.**

United States District Court,
S.D. Texas,
Houston Division.

Sept. 11, 1995.

Michael R. Klein, Arthur F. Mathews, Andrew B. Weissman, Robert F. Hoyt, Wilmer Cutler & Pickering, Washington, DC, Scott J. Atlas, N. Scott Fletcher, Vinson & Elkins, Houston, TX, for defendant.

Philip W. Offill, Jr., Fort Worth, TX, for plaintiff.

## MEMORANDUM AND OPINION

ROSENTHAL, District Judge.

Pending before this court are a motion for partial summary judgment filed by the Securities & Exchange Commission ("SEC"), (Docket Entry No. 33), and a cross-motion for summary judgment filed by Howard S. Hoover, Jr. ("Hoover"), (Docket Entry No. 37).

The facts of this insider trading case are unusual. The information allegedly used as the basis for the insider's stock sale was not information that was later publicly disclosed. The "inside information" at issue was an internal year-end earnings estimate that revised a year-end earnings estimate disclosed ten days earlier. Before the revised estimate was disclosed, it was replaced by another revised estimate, which was publicly disseminated. The market reaction in the sum-

mary judgment record was not to the disclosure of the internal estimate available at the time of the insider's trade, but to the later, and more pessimistic, earnings estimate.

On the specific facts established by the record before this court, and for the reasons stated below, the SEC's motion is DENIED and Hoover's motion is GRANTED. The remaining motions are DENIED as MOOT.

## I. Background

Hoover was the General Counsel for Browning Ferris Industries, Inc. ("BFI"). On August 12, 1991, BFI had filed its third quarter Form 10–Q for the three months ending June 30, 1991.[1] The Form 10–Q included the predictive statement that "income from continuing operations for fiscal 1991 will be approximately 10 percent lower than ... reported for fiscal 1990." During August 21–23, 1991, Hoover learned that BFI's Assistant Comptroller for Financial Accounting believed that year-end earnings from continuing operations could be 10 to 12 percent lower than 1990. (Docket Entry No. 41, Tab 5).

On August 23, 1991, Hoover sold 15,000 shares of his BFI common stock, approximately one-half of his BFI holdings. Hoover sold when the stock was at $27 per share; he realized approximately $405,000, before commissions.

On September 3, 1991, BFI filed a Form 8–K with the SEC, announcing that "management currently believes that income from continuing operations for fiscal 1991 will be approximately 12 percent to 15 percent lower than ... reported for fiscal 1990." In the two days following BFI's September 3 filing, the market price of BFI's stock decreased approximately 20 percent, in heavy trading.

The SEC filed this suit against Hoover on January 11, 1994, alleging that his August 23, 1991 stock sale violated (15 U.S.C. § 78j(b)), Rule 10b–5, (17 C.F.R. § 240.10b–5), and Section 17(a) of the Securities Act (15 U.S.C. § 77q(a)). The SEC alleged that when Hoo-

ver made the trade, he had material inside information that BFI had not disclosed to the public. The SEC asserts that Hoover should be required to disgorge approximately $80,500, representing the losses Hoover allegedly avoided by trading on August 23, 1991, based on the inside information. (*See* Docket Entry No. 41, Tab 18, p. 20).

The SEC has moved for partial summary judgment on the issues of duty, materiality, and the non-public nature of the information Hoover possessed. The SEC contends that only the issue of *scienter* is left for trial.[2] (Docket Entry No. 34).

Hoover has cross-moved for summary judgment on the grounds that the information he possessed at the time of the sale was, as a matter of law, not material, and that on the undisputed evidence, he did not act with *scienter.* (Docket Entry No. 38).

## II. The Standard for Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56. Under FED. R.CIV.P. 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue for trial." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Leonard v. Dixie Well Serv. & Supply, Inc.,* 828 F.2d 291, 294 (5th Cir.1987). An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. A fact is "material" if its resolution in favor of one party might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The party moving for summary judgment must demonstrate the absence of a genuine issue of

---

**1.** BFI's 1991 fiscal year began on October 1, 1990 and ended on September 30, 1991.

**2.** The SEC also seeks summary judgment that, as a matter of law, the SEC's civil enforcement

authority does not violate the separation of powers required by Article II of the Constitution. The court does not reach this issue.

material fact, but need not negate the elements of the nonmovant's case. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (en banc). If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response. *Little*, 37 F.3d at 1075.

Where the moving party has met its Rule 56(c) burden, the nonmovant cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. *Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186, 199 (5th Cir., *cert. denied*, 488 U.S. 926, 109 S.Ct. 310, 102 L.Ed.2d 329 (1988)). The nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *Little*, 37 F.3d at 1075 (citing *Celotex*, 477 U.S. at 323–27, 106 S.Ct. at 2553–54). The nonmovant's burden is not satisfied with "some metaphysical doubt as to the material facts." *Little*, 37 F.3d at 1075 (citing *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356), or by "unsubstantiated assertions," "conclusory allegations," or a mere "scintilla" of evidence. *Little*, 37 F.3d at 1075 (citations omitted). The nonmoving party must come forward with "specific facts showing that there is a *genuine issue for trial.*" *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1356 (quoting Fed. R.Civ.P. 56(e)) (emphasis in original); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Leonard*, 828 F.2d at 294.

In deciding a summary judgment motion, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513. This court must resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts. *Little*, 37 F.3d at 1075. The court does not, however, *"in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." Id.* (emphasis in original). Resolving actual disputes of material facts in favor of the nonmoving party "is a world apart from assuming that general averments embrace the specific facts needed to sustain the complaint. It will not do to presume the missing facts because without them the affidavits would not establish the injury that they generally allege." *Little*, 37 F.3d at 1075.

The nonmoving party's burden is not affected by the type of case; summary judgment is appropriate in *any* case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant. *Little*, 37 F.3d at 1069 (citing *Armstrong v. City of Dallas*, 997 F.2d 62 (5th Cir.1993)). "Rule 56 *mandates* the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Little*, 37 F.3d at 1075 (citing *Celotex*, 477 U.S. at 321, 106 S.Ct. at 2552).

### III. The Legal Standards for Insider Trading Liability

The SEC's First Amended Complaint alleges that Hoover traded in BFI stock while in possession of material inside information, violating section 10(b) of the Exchange Act, Rule 10b–5, and section 17(a) of the Securities Act.

A violation of section 10(b) and section 17(a) occurs when a corporate insider trades on the basis of material inside information which has not been disclosed. *Chiarella v. United States*, 445 U.S. 222, 226, 100 S.Ct. 1108, 1114, 63 L.Ed.2d 348 (1980); *Dirks v. S.E.C.*, 463 U.S. 646, 653, 103 S.Ct. 3255, 3261, 77 L.Ed.2d 911 (1983). The corporate insider's duty to "disclose or abstain" arises from the existence of a relationship affording access to inside information intended to be available only for a corporate purpose, and the unfairness of allowing a corporate insider to take advantage of that information by trading without disclosure. *Chiarella*, 445 U.S. at 226, 100 S.Ct. at 1114; *Dirks*, 463 U.S. at 653, 103 S.Ct. at 3261; *In re Zenith Laboratories Sec. Litig.*, No. 86–3241A, 1993 WL 260683 at *7 (D.N.J. Feb. 11, 1993). Directors, officers, and principal shareholders all qualify as corporate insiders under

section 10(b), if they have obtained confidential information through their positions with the corporation. *In re Compaq Securities Litigation,* 848 F.Supp. 1307, 1310 n. 7 (S.D.Tex.1993); *In re Cady Roberts & Co.,* 40 S.E.C. 907 (1961).

## A. Duty

■ As BFI's General Counsel, Hoover was an "insider," with a special confidential relationship to BFI, who had a duty not to trade before disclosing material nonpublic information acquired through his position, or waiting until it had been disclosed. *In re Compaq Securities Litigation,* 848 F.Supp. at 1310 n. 7. This issue is not disputed.

## B. Materiality

The Supreme Court has adopted a single standard for materiality in section 10(b) and Rule 10b–5 actions, including those based on insider trading. That standard is as follows:

A fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]. . . . [T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.

*Basic v. Levinson,* 485 U.S. 224, 231, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988); *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 448, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976).

■ The materiality standard requires a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of a reasonable investor. *Justin Industries v. Choctaw Securities, L.P.,* 920 F.2d 262, 267 (5th Cir.1990). The test is an objective, not subjective, inquiry. "The application of the reasonable investor test is appropriate because ... materiality only can be judged against an objective standard of investor behavior." *Isquith v. Middle South Utilities, Inc.,* 847 F.2d 186, 208 (5th Cir.1988) (citations omitted). In the context of trading on the basis of inside information, the *TSC Industries* standard re-

quires the information to "be reasonably certain to have a substantial effect on the market price of the security." *Elkind v. Liggett & Myers, Inc.,* 635 F.2d 156, 166 (2d Cir. 1980).

■ Materiality is a mixed question of law and fact. *Sioux, Ltd., Sec. Litigation v. Coopers & Lybrand,* 914 F.2d 61, 65 (5th Cir. 1990). Both the SEC and Hoover have moved for summary judgment on this issue. The parties agree that on the present record, this court should determine whether, as a matter of law, Hoover's information was material.

## IV. The Facts as to Hoover's Stock Sale

The parties have largely agreed on the relevant facts. The chronology of the facts relating to Hoover's sale, in relation to the development of the information available, is set out below.

## A. The Chronology of Events

**12/14/90** BFI filed its 1990 Form 10–K. This Form 10–K included the statement that "[m]anagement currently expects that income from continuing operations for fiscal 1991 *may be only slightly above the $257 million of income from continuing operations reported for fiscal 1990.*" (Emphasis added). This information was repeated in the annual report and paraphrased in a news article dated February 6, 1991.

**1/23/91** BFI published a press release announcing fiscal year 1991 first quarter results. Revenues were 15 percent higher than the prior year; income from continuing operations was 13 percent lower than the prior year.

**2/12/91** BFI filed its first quarter Form 10–Q, which repeated the financial results given in the January 23 press release. The Form 10–Q also contained the statement that "[m]anagement currently expects that income from continuing operations for fiscal 1991 *may be somewhat less than the $257 million of income from continuing operations reported for fiscal 1990.*" (Emphasis added).

**4/17/91** BFI published a press release announcing fiscal 1991 second quarter results. Revenues increased 8 percent over the prior year; income from operations fell 17 percent from the prior year's figure; and income from continuing operations fell 20 percent from the prior year.

**5/10/91** BFI filed its second quarter Form 10–Q for the three months ending March 31, 1991. The Form 10–Q repeated the financial results from the April 15 press release. It also contained the statement that "[b]ased on the trends experienced to date, it is management's current belief that *income from continuing operations could be somewhat below the $257 million of income reported for the prior year.*" (Emphasis added).

**6/27/91** BFI published a press release containing the statement that "[b]ased upon trends experienced to date, management of BFI currently believes that *results from continuing operations for the second half of fiscal 1991 will approximate results from the first half of the fiscal year. As a result, income from continuing operations for fiscal 1991 will be lower than the $257 million ($1.68 per share) reported for fiscal 1990.*" (Emphasis added).

Given the earnings per share at that time, the predictive statement that income from continuing operations would approximate results from the first half of the fiscal year was an estimate that income from continuing operations for fiscal 1991 would be approximately 8 percent lower than for fiscal 1990. (Docket Entry No. 41, Tab 15, p. 1).

**7/19/91** BFI published a press release announcing fiscal 1991 third quarter results. Revenues increased by 5 percent over the prior year; income from operations was down 25 percent from the prior year; and income from continuing operations was down 28 percent from the prior year.

**7/19/91** During July 1991, Hoover discussed with his accountant the possibility of liquidating enough shares of BFI stock to pay down personal debts. (Declaration of Milton Millman, Senior Tax Advisor, Arthur Andersen & Co., Docket Entry No. 41, Tab 2, ¶ 5).

**8/12/91** BFI filed its third quarter Form 10–Q for the three months ending June 30, 1991. The Form 10–Q repeated the numbers in the July press release and contained the statement that "income from continuing operations for fiscal 1991 *will be approximately 10 percent lower than the $257 million ($1.68 per share) reported for fiscal 1990.*" (Emphasis added).

**8/12/91** BFI's management group held a meeting during which the members discussed an internal report of BFI's actual earnings for July 1991, the first month of the fourth quarter. Gerald Burger, BFI's Corporate Secretary, served as secretary of the meeting. Bruce Ranck, BFI's Executive Vice President for Solid Waste Operations in North America, led a discussion of the July results. The internal report stated that BFI's earnings for July 1991 were lower than earnings had been for each month of the third quarter. There is no evidence that Hoover attended this meeting or was aware of the matters discussed.

**The Week of 8/12/91** Hoover asked his assistant, Susan Morgan, to gather information about the amount of Hoover's bank and consumer indebtedness and to determine the "payoff" amounts for each debt category.

**8/12/91–8/22/91** Susan Morgan completed gathering information from Hoover's lenders and determined that Hoover needed to raise approximately $395,000 to repay his loans. She relayed the information to Hoover's accountant, who calculated that Hoover should also raise approximately $20,000 for taxes. Hoover and his accountant determined that he could pay his debt and tax obligations by selling approximately 15,000 shares of BFI stock at the then-current market price of $27 per share, and by using interest accumulated in a bond fund.

**8/20/91** A draft of a Shareholders' Report scheduled to be mailed to shareholders within two weeks was circulated to senior management, including Hoover. This draft contained the statement that the company believed that "results from con-

tinuing operations for fiscal 1991, ending September 30, 1991, [would] be approximately ten percent lower than the $257 million ($1.68 per share) reported for fiscal 1990." This repeated the August 12, 1991 Form 10–K language.

8/20/91 BFI's accounting department prepared a mid-month earnings report and projection for August, the second month of BFI's fourth fiscal quarter. The internal report projected that total earnings for August would be lower than July actual earnings had been.

8/21/91 or 8/22/91 Greg Robertson, BFI's Assistant Comptroller for Financial Accounting, told Hoover that "based on August mid-month estimates, our analysis had shown that annual earnings could be as much as 12 percent below prior year earnings rather than the 10 percent previously disclosed in the 3rd Quarter Form 10–Q." (Docket Entry No. 41, Tab 5, ¶ 2). Robertson informed "Mr. Hoover and/or Mr. Lobstein," a lawyer in the BFI legal department primarily responsible for securities laws issues, that "... they, the Financial Department, were thinking about changing the 'approximately 10 percent' to 'approximately 12 percent' in [the next] Shareholders' Report." (Docket Entry No. 41, Tab 6, p. 37).

Hoover directed Lobstein to confer with Robertson and to contact Tom Amonett, a lawyer at Fulbright & Jaworski, BFI's outside securities counsel, to discuss whether the proposed change was material. (Investigation testimony of Tim Lobstein, Docket Entry No. 41, Tab 7, p. 23). Lobstein was unable to reach Amonett. After his discussion with Robertson, Lobstein "came away that, based on [Robertson] saying maybe 10 percent, maybe 12 percent, that based on the various variables they were looking at for the projections, it could still be 10 percent." (Docket Entry No. 41, Tab 7, pp. 19–20). Lobstein asked Robertson if a greater decline should be used in any disclosure, such as 10–15 percent below the previous year. That proposal got "flatly rejected by Greg Robertson." (Id., at p. 33).

8/22/91 Lobstein reported to Hoover that Lobstein did not believe "that we had something that we had to go out with a press release to the shareholders at that time." Lobstein concluded that, in the next regularly scheduled Shareholders' Report, the estimate of year-end earnings should be revised to 10–12 percent below 1990 rather than "approximately 10 percent" below because "we needed to give the shareholders that up to date information." (Id., at p. 26).

Hoover had also concluded that the proposed language change from "approximately 10 percent" below fiscal 1990 results from continuing operations to "approximately 10 to 12 percent" below fiscal 1990 results was not a material change to the estimated year-end forecast. (Docket Entry No. 41, Tab 1, p. 7–8).

8/22/91 Hoover's secretary contacted Gerald Burger, BFI's Corporate Secretary, and informed him that Hoover wanted to sell stock. (Investigation Interview of Gerald Burger, Docket Entry No. 41, Tab 8, p. 17). BFI's policy required officers or directors who wanted to sell BFI stock to notify Gerald Burger, who would then check the proposed sale with the Chief Financial Officer, John Stanton, and with the office of General Counsel. (Id., at p. 12).

On August 22, Stanton was on vacation and could not be contacted. Burger believed that Hoover's contemplated sale presented no problem. The summary judgment record is that Burger did not know when he discussed the proposed sale with Hoover that Robertson believed that the earnings estimate might need to be lowered from approximately 10 percent to approximately 10 to 12 percent below the prior year. Burger testified that when he spoke to Hoover about Hoover's proposed stock sale, Burger had not received any information about a possible change in the year end earnings estimate in the next public report to stockholders from "approximately 10%" below fiscal 1990 to a range of "10% to 12% below the prior year." (Docket Entry No. 49, Attachment F, p. 24).

**8/22/91** Hoover instructed his broker to sell 15,000 shares of his BFI stock at a minimum price of $27.00 per share.

**8/23/91** Hoover's broker executed the trade at $27.00 per share in the afternoon. During the morning, BFI's stock price was below $27.00. The broker called to ask Hoover if he wanted to sell at market. Hoover told him not to sell below $27.00.

**8/26/91** BFI management held a meeting at which the August mid-month projections were discussed, focusing on the effect on projected fourth quarter earnings rather than the estimated year-end forecast.

**8/27/91** A draft of the quarterly Shareholders' Report was circulated among management. This draft contained an estimate that income from continuing operations for the year could be down 10 percent to 15 percent from the prior year.

**8/28/91–8/30/91** BFI's management decided to issue a Form 8–K. As of August 28, 1995, the accounting department had not completed preparing the projections for the Form 8–K. (Testimony of Tim Lobstein, Docket Entry No. 35, Tab G, p. 46).

**9/3/91** BFI filed a Form 8–K, announcing management's belief that "results from continuing operations for the fourth quarter of the 1991 fiscal year will be approximately 15% to 25% less than the results experienced in the third quarter of fiscal 1991. As a result, management currently believes that *income from continuing operations for fiscal 1991 will be approximately 12% to 15% lower than the $257 million ($1.68 per share) reported for fiscal 1990.*" (Emphasis added).

**9/4/91–9/5/91** The market reacted negatively to BFI's Form 8–K disclosures.

### B. Hoover's Information on August 23, 1991

The undisputed evidence is that during August 21 to August 23, 1991, Hoover learned that Robertson believed that "annual earnings could be as much as 12 percent below prior year earnings rather than the 10 percent previously disclosed in the 3rd Quarter Form 10–Q." (Docket Entry No. 41, Tab 5, ¶ 2). "On August 22 ... Robertson informed [Hoover] that in the next regularly scheduled public disclosure, he wished to expand the description of that projection [from the Form 10–Q filed ten days earlier] to reflect that 1991 earnings could be as much as 12 percent lower than 1990." (Docket Entry No. 41, Tab 1, ¶ 12). The last public statement, issued 10 days earlier, estimated that earnings from continuing operations would be down approximately "10 percent."

There is no evidence in the summary judgment record that Hoover had access to the mid-month earnings information itself. The uncontroverted summary judgment evidence is that Hoover did not see the actual documents containing the August 1991 mid-month earnings and estimates. (Docket Entry No. 35, SEC Inquiry testimony of Howard Hoover, Tab B, p. 45).

It is undisputed that on August 22 and 23, 1991, Hoover did not know the information reported in the Form 8–K on September 3, 1991. The undisputed summary judgment evidence is that the 12 percent to 15 percent decline estimated in the September 3, 1991 Form 8–K did not begin to emerge until the week of August 26, 1991. (Affidavit of Robertson, Assistant Comptroller, Financial Accounting, Docket Entry No. 41, Tab 5, ¶ 3). A draft Shareholders' Report containing a projection that year-end income from continuing operations would be approximately 10 percent to 15 percent below the prior year was not circulated until August 27, 1991. The decision to file the Form 8–K was not reached until August 28, 1991. What Hoover knew on August 22 and 23, 1991 was that Robertson estimated that annual earnings could be 10 to 12 percent below the prior year, rather than "approximately 10 percent" below, as BFI publicly disclosed 10 days earlier.

■ A defendant's liability for insider trading can be based only on material, nonpublic information known at the time of the trade, not on information learned later. *See, e.g., TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449 n. 10, 96 S.Ct. 2126, 2132 n. 10, 48 L.Ed.2d 757 (1976); *United States v. Teicher,* 987 F.2d 112, 120 (2d Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 467, 126 L.Ed.2d 419 (1993). On the undisputed facts,

the information that management believed that income from continuing operations would be 12 percent to 15 percent lower than the previous year was not a basis for Hoover's trade.

■ Internal projections of profits and revenues are the type of confidential information that a corporate officer obtains by reason of his position. Such projections give rise to a duty to abstain or disclose if they are material. *See, e.g., SEC v. Fox,* 855 F.2d 247, 252–53 (5th Cir.1988).

## C. The Materiality of the Estimated Decrease in the Year–End Earnings Projection

The SEC argues that the mere fact that BFI's Financial Department wanted to revise the earnings estimate downward on August 23, 1991 is material, regardless of the size of the proposed revision. (Docket Entry No. 34, p. 36). The SEC argues that the market's reaction to the later Form 8–K disclosure (12 percent to 15 percent below the prior year) shows that the earlier projection (10 percent to 12 percent below the prior year) was material. The SEC also argues that the proposed revision was material because it changed the last public report predicting that fourth quarter results would "approximate" the third quarter results, contradicting BFI's earlier "signals" to the public that management believed earnings had stabilized.

### 1. The Total Mix of Information Available

The Fifth Circuit and other circuits have recognized that "projections of future performance not worded as guarantees are generally not actionable under the federal securities laws." *Krim v. BancTexas Group, Inc.,* 989 F.2d 1435, 1446 (5th Cir.1993); *see also Hillson Partners Limited Partnership v. Adage, Inc.,* 42 F.3d 204, 212 (4th Cir.1994); *Raab v. General Physics Corp.,* 4 F.3d 286, 290 (4th Cir.1993). In *Krim,* the court affirmed summary judgment in favor of defendant BTX after concluding that BTX's optimistic statements about the company's future performance, even when contrasted with its alleged understatement of problem loans by 33 per-

cent, could not be material as a matter of law. *Id.* at 1445–49. The court emphasized the need to view materiality "in light of the surrounding circumstances," and in the context of the overall tone and content of the company's prior public disclosures. *Id.* at 1448.

The "total mix of information" BFI had been providing investors throughout fiscal year 1991 emphasized continuing uncertainty and negative factors affecting BFI's financial performance. This information came in BFI's reported actual earnings, in its public projections, and in the text of its public statements.

The SEC acknowledges that the public disclosures of BFI's actual earnings for fiscal year 1991 showed a pattern of declining earnings from continuing operations compared to the previous year. BFI's first quarter Form 10–Q showed that income from first quarter fiscal 1991 operations declined by 13 percent from the restated amount for the prior year. (Docket Entry No. 41, Tab 13, p. 10). BFI's second quarter Form 10–Q showed that income from continuing operations for the first half of fiscal 1991 decreased by 17 percent from the prior year. (Docket Entry No. 41, Tab 14, p. 11). The third quarter Form 10–Q, published 10 days before Hoover sold his stock, told investors that BFI's actual earnings were 28 percent below income from continuing operations for the third quarter of 1990.

BFI's public projections during fiscal 1991 also showed a negative trend. The 1990 Form 10–K projected that fiscal 1991 income would be "*slightly above the $257 million of income from continuing operations reported for fiscal 1990*" (Docket Entry No. 41, Tab 12, p. 25). The 1991 first quarter Form 10–Q stated that management expected income from continuing operations for fiscal 1991 to be "*somewhat less than the $257 million of income from continuing operations reported for fiscal 1990.*" (Docket Entry No. 41, Tab 13, p. 10). The 1991 second quarter Form 10–Q made a similar projection, stating that income from continuing operations "*could be somewhat below the $257 million of income reported for the prior year.*" (Docket Entry

No. 41, Tab. 15, p. 12). A press release issued June 27, 1991 stated that, "[b]ased upon trends experienced to date, management of BFI currently believes that *results from continuing operations for the second half of fiscal 1991 will approximate results from the first half of the fiscal year.*" (Docket Entry No. 41, Tab 15, p. 1). Income from continuing operations for the first half of fiscal 1991 was 77 cents per share. (Docket Entry No. 41, Tab 14, p. 2). Therefore, the June 27, 1991 statement is a projection that BFI's 1991 income from continuing operations would be approximately $1.54 per share, which is eight percent less than fiscal 1990's $1.68 per share.

The third quarter Form 10-Q, issued ten days before Hoover placed his order to sell, stated that "the Company believes that results from continuing operations for the fourth quarter of the current fiscal year will approximate results experienced in the current quarter. As a result, *income from continuing operations for fiscal 1991 will be approximately 10 percent lower than the $257 million ($1.68 per share) reported for fiscal 1990.*" (Docket Entry No. 41, Tab 16, p. 12).

The SEC argues that Hoover's August 22, 1991 information of a zero to two percentage point downward revision in the year-end earnings estimate was material because it meant a decline in the fourth quarter earnings estimate from the projection given in the third quarter Form 10-Q.

In the third quarter Form 10-Q, BFI stated that results for fiscal 1991 would be "approximately" 10 percent below fiscal 1990. The parties agree that calculating a fourth quarter earnings estimate from this third quarter Form 10-Q year-end earnings estimate yields a 36 cents per share projection. The third quarter actual earnings were 38 cents per share. The third quarter Form 10-Q year-end projection therefore included an anticipated eight percent decrease in the estimated fourth quarter earnings. (Docket Entry No. 41, Exhibit 18, p. 6).

A decrease in the fourth quarter earnings is consistent with the text of BFI's disclosures in the August 12, 1991 Form 10-Q.

The third quarter Form 10-Q included the following cautionary language:

During the third quarter of fiscal 1991, the Company's revenue growth and operating income were impacted negatively by (i) the reduction in commercial waste volumes due to the economic recession which has affected many of its North American markets, ... (iii) the emphasis of many commercial collection customers, as a result of the recession, on controlling and reducing operating costs, which has led to downward pressure on pricing, and (iv) the increased emphasis on recycling activities which has diverted a portion of the historic waste stream away from the higher margin collection and landfill operations and has been partially offset by increases in the currently lower margin recycling business. *Because the trends experienced to date are expected to continue through the remainder of fiscal 1991, largely as a result of the factors described above,* management of the Company believes that results from continuing operations for the fourth quarter of the current fiscal year will *approximate* results experienced in the current quarter. As a result, income from continuing operations for fiscal 1991 will be approximately 10% lower than the $257 million ($1.68 per share) reported for fiscal year 1990.

(Docket Entry No. 41, Exhibit 16, p. 12) (emphasis added).

This text specifically informed investors that the negative performance trends experienced in the first three quarters of fiscal 1991 were expected to continue. The materiality of Hoover's information must be measured in the context of the statements contained in BFI's prior public reports, including the third quarter Form 10-Q. *Krim,* 989 F.2d at 1448; *Isquith,* 847 F.2d at 207–08.

Lowering the year-end earnings estimate by zero to two percentage points, as Hoover and Robertson discussed, yields a fourth quarter earnings estimate of 33 to 36 cents per share. The third quarter Form 10-Q year-end income projection meant a projected decline in fourth quarter earnings from 38 cents in the third quarter to 36 cents per

share.[3] The proposed change in the year-end estimate meant a decrease of zero to eight percent from the fourth quarter earnings projection implicit in BFI's last public projection. (Docket Entry No. 38, pp. 28–29). This decrease is not inconsistent with BFI's public disclosures of the declining actual results from continuing operations and projections of decreasing income for fiscal 1991.

■ BFI's public projections during fiscal year 1991, the actual results of continuing operations reported during that period, and the text of BFI's public statements, did not "signal" such a belief that earnings had stabilized so as to make a downward revision of zero to two percentage points in the estimated year-end earnings material. During the fiscal year, BFI had downgraded its earnings projections four times. BFI's most recent public projection, released ten days before Hoover's sale, reported historical earnings down by 28 percent, reduced projected year-end earnings by another two percentage points, implied as much as an eight percent decline in estimated fourth quarter earnings, and predicted a continuation of the negative factors. The internal projected downward revision in the annual earnings estimate by zero to two percentage points, even considering the implication for the fourth quarter earnings estimate, was consistent with the past disclosures. In the context of all the public disclosures to BFI's shareholders, a zero to two percentage point incremental revision to the year-end earnings estimate was not material as a matter of law.[4]

Applying the standard of *TSC Industries* and subsequent cases, this court cannot say that Hoover's August 23, 1991 information of a zero to two percentage point decrease in year-end estimated earnings "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available." 426 U.S. at 449, 96 S.Ct. at 2132.

### 2. Market Reaction as a Measure of Materiality

The SEC cites *Elkind v. Liggett Myers*, 635 F.2d at 166, and *SEC v. Lund*, 570 F.Supp. 1397, 1401 (C.D.Cal.1983), to support its argument that the market impact of the September 3, 1991 Form 8–K shows that the information Hoover possessed when he sold on August 23, 1991 was material as a matter of law. (Docket Entry No. 34, pp. 38–39).

As noted above, this case is unusual in that the information Hoover had when he traded was not the information that was later publicly disclosed. The SEC must therefore rely on statistical analysis to try to determine what the market reaction would have been if Hoover's information had been publicly disclosed. (Docket Entry No. 41, Exhibit 18, pp. 17–20).

3. Hoover correctly notes that nothing in the summary judgment record suggests that during the week of August 21, 1991, Hoover or anyone else at BFI made the calculations necessary to quantify the implications of a zero to two percentage point decline in the year-end earnings estimate on the earlier fourth quarter earnings estimate. The SEC does not dispute this. Nor does the SEC assert that BFI had publicly projected a specific fourth quarter 1991 income from continuing operations. The SEC's own expert agrees that the third quarter Form 10–Q projection of a 10 percent decrease in year-end earnings meant an eight percent decrease in estimated fourth quarter income. (Docket Entry No. 41, Exhibit 18 at p. 6).

4. The SEC points to two analysts' reports to support its argument that the market believed BFI was "poised for a recovery" during the fourth quarter of fiscal 1991. (Docket Entry No. 49, pp. 11–12). The record does not support the SEC's contention. For example, on April 23,

1991, Kenneth C. Leung, a research analyst with Smith Barney Shearson, Inc., had revised his own estimate of BFI's earnings per share for fiscal 1991 from $1.80 to $1.73, stating "[w]e must emphasize the long-term nature of the [buy] recommendation, as we see no near-term catalyst to move the stock until the fourth quarter, when we expect the year-to-year earnings comparison to turn flat to positive." (*Id.* at Exhibit B). On July 2, 1991, the analyst *decreased* his earnings per share estimate from $1.73 for fiscal 1991 to $1.55. (*Id.*).

Oppenheimer & Co., Inc. noted in its July 1, 1991 report that BFI has been experiencing "economic-related weakness ... for some time" and was "reporting that this has become more widespread than expected." (Docket Entry No. 49, Exhibit C). Smith Barney Shearson, Inc. similarly observed in its July 23, 1991 report that "[T]he sluggish economy continues to plague the company, while intense pricing competition ... prevented the company from even enjoying the normal seasonal upturn." (*Id.* at Exhibit B).

The publicly disclosed information was the September 3, 1991 Form 8–K projection of a decrease of 12 percent to 15 percent in fiscal 1991 income. The information Hoover had was a projection by Robertson of a reduction in income of "10 to 12 percent" from fiscal 1990 income. The last public projection on August 12, 1991 was of an "approximately" 10 percent decrease in income. The difference between the September 3, 1991 disclosure and the August 12, 1991 public disclosure is more than twice the difference between Robertson's August 22, 1991 projection of a reduction in income of "10 to 12 percent" and the August 12, 1991 public projection of an "approximately 10 percent" reduction. A market reaction to the much worse, later projection does not support the SEC's argument that the information Hoover had on August 23, 1991 was material as a matter of law.

█ The only evidence in the summary judgment record of an actual market effect of a two percentage point downward revision in estimated annual earnings for fiscal year 1991 does not support the SEC's position. BFI's June 27, 1991 statement that "results from continuing operations for the second half of fiscal 1991 will approximate results from the first half of the fiscal year" projected that BFI's 1991 income from continuing operations would be eight percent less than fiscal 1990's $1.68 per share. In the third quarter Form 10–Q, filed on August 12, 1991, BFI revised this projection to state that management believed that income from continuing operations would be approximately ten percent lower than fiscal 1990. There was no significant market reaction to that downward revision in the earnings estimate.

Under the *Elkind v. Liggett Myers* standard argued by the SEC, which measures materiality by the market's reaction to information, the information Hoover possessed was not material as a matter of law.

### 3. The Reactions of Other Insiders as a Measure of Materiality

█ The SEC also argues that the reactions of other corporate officers to the news of Hoover's sale, including Fletcher Thorne–Thomsen, BFI's vice-president of corporate relations, and Burger, BFI's corporate secretary, demonstrate the materiality of the information he possessed. (Docket Entry No. 49, p. 13). The importance attached to information by those who receive it is a factor considered "a major index of materiality." *SEC v. Bausch & Lomb, Inc.*, 565 F.2d 8, 18 (2d Cir.1977).

Thorne–Thomsen testified that he "was concerned that [Hoover] had sold some shares." (Docket Entry No. 35, Tab. D, p. 15). This does not support the argument that the zero to two percentage point downward revision that Hoover knew about was material. Thorne–Thomsen did not have any conversation with Hoover about the sale of Hoover's stock until the end of the week of August 26, 1991, after the management meeting at which the mid-August projections were discussed in detail. The internal earnings estimate that Thorne–Thomsen had was not the same information Hoover possessed when he traded. Thorne–Thomsen's assessment of the materiality of the information he knew when he learned of Hoover's sale cannot support the inference that Hoover's information when he sold is material.

Burger testified that, on August 28, 1991, he told David Hopkins, BFI's Chief Accounting Officer, "If you haven't sold, don't." (Docket Entry No. 49, Attachment F, p. 25). Hopkins had earlier mentioned to Burger that he was thinking about selling some BFI stock. Burger reached the conclusion that insiders should abstain from selling after he had seen the numbers for August and the downward projections then contemplated by the accounting department. (Docket Entry No. 49, Attachment F, at pp. 25–26). The downward projections were in the August 27, 1991 draft of the quarterly report to stockholders, which Burger read on the morning of August 28. The draft "indicated that the results for the year could be down some 10 to 15 percent from the prior year." (*Id.*, p. 26). This information is not the same information that Hoover had when he placed his sale order on August 22 and sold on August 23. The fact that Burger considered this revision of the earnings estimate to be a material change does not require the conclusion that the earlier information was also material.

 The only summary judgment evidence of insiders' reactions to Robertson's proposed zero-to-two percentage point revision supports Hoover's contention that the information is not material as a matter of law. Lobstein was the BFI in-house attorney with specific expertise in, and responsibility for, securities laws compliance. He testified that he came to the conclusion that the zero to two percentage point revision was not material and did not require immediate disclosure. (Docket Entry No. 41, Tab. 7, p. 26).

Lobstein did believe that the next regularly scheduled public pronouncement should contain the revised estimate. The SEC argues that, under *Bausch & Lomb,* "BFI's decision to file a Form 8–K on September 3, 1991, is one indication of the magnitude of the information." (Docket Entry No. 34, at p. 38).

 On the facts before this court, the SEC's argument results in two standards of materiality. Under the SEC's argument, the same information could be insufficiently material to require immediate disclosure, yet sufficiently material to require that an insider abstain from trading. The same standard for materiality is used in insider trading cases as in cases alleging a fraudulent failure to disclose on the part of a company. *See, e.g., Isquith v. Middle South Utilities, Inc.,* 847 F.2d 186, 208 (5th Cir.1988) (applying the *TSC v. Northway* standard in a failure to disclose case); *Alfus v. Pyramid Technology Corp.,* 745 F.Supp. 1511, 1518 (N.D.Cal.1990) (holding that "[s]ince plaintiff has failed to allege any material non-public information or omissions which should have been disclosed, it cannot be found at this juncture that the insiders had a duty to disclose [before trading]").

## V. Conclusion

The information that Hoover possessed when he sold BFI stock was that Robertson wished to revise the public projection of earnings per share from approximately 10 percent lower than last year to "10 percent to 12 percent lower than last year." In the context of BFI's earlier public disclosures, the zero to two percentage point estimated

downward revision of the estimated year-end earnings is not material as a matter of law.

The SEC's motion for partial summary judgment is DENIED. Hoover's motion for summary judgment is GRANTED. All other motions are DENIED as moot.

Hoover is to submit a proposed judgment within ten days from the date this order is entered.